**UNITED STATES of America**

v.

**Anthony MIRRA, Defendant.**

United States District Court
S. D. New York.
July 19, 1963.

Vincent L. Broderick, U. S. Atty., by Wm. M. Tendy, Asst. U. S. Atty., for plaintiff.

Charles H. Miller, New York City, for defendant.

EDELSTEIN, District Judge.

■■ In an incident that has become one of several *causes célèbres* of a trial frequented by scenes of "outrage * * disruption [and] violence in the courtroom," [1] the defendant Anthony Mirra, while under cross-examination, "stood up, took the witness chair on which he was sitting, and hurled it at the Assist-

---

1. The incident occurred during a twelve week trial upon an indictment charging twenty-nine defendants with violations of the Narcotic Drugs Import and Export Act. 21 U.S.C. §§ 171 et seq. Mirra's conviction was affirmed recently in United States v. Bentvena, 2d Cir., 1963, 308 F.2d 47. The first trial before Judge

Levet of this court ended in a mistrial when the foreman of the jury sustained injuries on the eve of summation at which time no alternate jurors remained. At the conclusion of the first trial and prior to the declaration of a mistrial, Judge Levet adjudged Mirra in contempt and sentenced him to twenty days in jail.

ant United States Attorney \* \* \* threw it some fifteen feet." [2] The chair struck the jury rail about three feet from the lectern where the Assistant United States Attorney was standing. For committing such a violent outrage upon the dignity and decorum of the court, Mirra was summarily held in contempt of court and sentenced to imprisonment for one year. On June 26, 1962, the trial judge filed his certificate pursuant to Fed.R.Crim.P. 42(a) reciting the facts of the contemptuous conduct.[3] On July 12, 1962, the Government filed Indictment 62 Cr. 727, in one count which charged that Mirra:

"Unlawfully, wilfully and knowingly did with the use of a deadly and dangerous weapon, forcibly assault, resist, oppose, impede, intimidate and interfere with an Assistant United States Attorney while said Assistant United States Attorney was engaged in and on account of the performance of his official duties."

This indictment, charging a violation of 18 U.S.C. § 111 [4] was predicated on the

See United States v. Galante, 298 F.2d 72 (2d Cir. 1962). An insight into the machinations of the defendants and the succession of delays and attempts to forestall a trial may best be gained by referring to the Bentvena case and to some of the related cases previously decided by our Court of Appeals. United States v. Bentvena, 288 F.2d 442 (2d Cir. 1961); United States v. DiPietro, 302 F.2d 612 (2d Cir. 1962); United States v. Galante, supra; United States v. Bentvena, 2 Cir., 304 F.2d 883. Some of the more egregious incidents by the defendants were the storming of the jury box by the defendant Panico; Panico's faked hanging attempt and his attempt to slash his wrists in jail; the constant outbursts by the defendants in the presence of the court. See United States v. Bentvena, 2d Cir., 308 F.2d 47, supra and passim; United States v. Panico, 308 F.2d 125 (2d Cir. 1962).

The quoted language "outrage, disruption and violence" is from the trial judge's description of Mirra's conduct as it appears in the contempt citation.

2. Trial transcript, pp. 6461–6463, June 1, 1962.

3. Rule 42(a), Fed.R.Crim.P. provides:
"*Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

The exhibit attached to the trial judge's certificate reads as follows:
"The Court: The record will reflect that Mirra stood up, took the witness chair on which he was sitting, and hurled it at the Assistant United States Attorney, Rosner, threw it some fifteen

feet. Does that accurately reflect the incident?
"Mr. Peluso: Yes.
"Mr. Krieger: It struck the jury rail about three feet from the lectern where Mr. Rosner was standing. It hit on top of the jury rail. There are bruises which Mr. Rosner has just indicated to me which indicate where the jury rail was struck.
"Mr. Rosenthal: In front of juror No. 4.
"Mr. Krieger: Yes, precisely in front of juror No. 4.
"I would like to state further in my description, your Honor, that after I recovered sufficient composure to look, there was unquestionably extreme expression of fright upon the faces of the jury.
"The Court: The chair was thrown with such force as to break a leg off it."
(Exhibit No. 1 to Certificate of Court, 60 Civ. 436)

4. 18 U.S.C. § 111 provides:
"*Assaulting, resisting, or impeding certain officers or employees*
"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties shall be fined not more than $5,000 or imprisoned not more than three years, or both.
"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,-000 or imprisoned not more than ten years, or both."
18 U.S.C. § 1114 provides:
"*Protection of officers and employees of the United States*
"Whoever kills any judge of the United States, any United States Attorney, any

chair-throwing incident of June 4, 1962. Mirra now moves to dismiss the assault indictment on the ground that the Fifth Amendment's guarantee against Double Jeopardy [5] is violated by the Government's attempt "to punish the same conduct upon successive proceedings." [6] Mirra urges that the Double Jeopardy guarantee is applicable since the contempt conviction as well as the assault indictment are based on the same fact situation and "that both the instant indictment and the contempt conviction require the self-same evidence." The defendant seeks to avoid being placed in the path of a cross-fire of, as he terms them, "prosecutions." Having already proceeded to judgment on the chair-throwing incident the Government is barred, Mirra alleges, by the Fifth Amendment's Double Jeopardy protection from prosecuting him on a "subsequent indictment." The defendant's claim is appealing but not well-founded. It is axiomatic that the prohibition of the Double Jeopardy clause is "not against being twice punished, but against being twice put in jeopardy." Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963); United States v. Ball, 163 U.S. 662, 669, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). And an examination of the summary contempt power will provide a more definite answer to Mirra's predicament and will serve to demonstrate that the Government is not barred from prosecuting a summary contemnor on a subsequent assault indictment.

Possibly no other exercise of judicial discretion has evoked as much critical discussion and recurrent inquiry as summary contempt. See generally, Goldfarb, The Constitution and Contempt of Court, 61 Mich.L.Rev. 283 (1962); Nelles, The Summary Power to Punish for Contempt, 31 Colum.L.Rev. 956 (1931); [7] Yates v. United States, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); Sacher v. United States, 343 U.S. 1, 8, 72 S.Ct. 451, 96 L. Ed. 717 (1951). Mr. Justice Black's oft-quoted statement in Green v. United States, 356 U.S. 165, 193–194, 78 S.Ct. 632, 2 L.Ed.2d 672 (1957) (dissenting opinion), although made in a different context, is perhaps the high water mark of a flood of criticism leveled at the use of the contempt power itself and its increased utilization without affording the contemnor the commensurate protection of constitutional safeguards.

"The power of a judge to inflict punishment for criminal contempt by means of a summary proceeding stands as an anomaly in the law. In my judgment the time has come for a fundamental and searching reconsideration of the validity of this power which has aptly been characterized * * * as, 'perhaps, nearest akin to the despotic power of any power existing under our form of government.' Even though this extraordinary authority first slipped

Assistant United States Attorney * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under sections 1111 and 1112 of this title."

5. " * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; * * *"

6. Brief of Defendant Mirra at p. 4.

7. "In the past three quarters of a century there have been many signs that the power to punish summarily for contempt of court is encroaching upon the once sacred 'right' of trial by jury in criminal cases. * * * Trial by jury was an important egg in the setting from which democracy was hatched. And its decline is cumulative of much other evidence that democracy itself is in decline." Nelles, supra at 956.

"[The contempt power] is peculiar within our system in that other legal systems (not based on the English) have no such power of the nature or propositions of ours. It is peculiar within our system in that no other of our legal powers is comparable to contempt in pervasiveness or indefiniteness. Nor does any analogy come to mind of a legal power with the inherent constitutional anomalies characteristic of contempt * * * Few legal devices find conflict with the lines of our Constitution with the ubiquity of the contempt power." Goldfarb, supra at 1283.

into the law as a very limited and insignificant thing, it has relentlessly swollen, at the hands of not unwilling judges, until it has become a drastic and pervasive mode of administering criminal justice usurping our regular constitutional methods of trying those charged with offenses against society."

Id., 356 U.S. at 194, 78 S.Ct. at 648 (1957). See Reich, Mr. Justice Black and the Living Constitution, 76 Harv. L.Rev. 673,707 (1963).[8] Mr. Justice Black's concern that the punitive nature of a summary contempt conviction requires that a summary contemnor be afforded the full panoply of constitutional and statutory safeguards has not gained currency. See Sacher v. United States, supra, 343 U.S. at 20–23, 72 S.Ct. at 460–462 (dissent). Indeed, the courts have rejected attempts by contemnors to denominate their contemptuous conduct as a criminal offense to which more pervasive procedural safeguards pertain. Sacher v. United States, supra (contemnors not entitled to court trial on summary contempt conviction committed in presence of court); Green v. United States, supra (conviction for criminal contempt without criminal trial constitutional); Cooke v. United States, 267 U. S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925); Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888).

In rejecting attempts to equate, for procedural purposes, contempt with crime, the courts have bottomed their decisions on a rationale that finds its roots in "[s]tark necessity." Green v. United States, supra, 356 U.S. at 213, 78 S.Ct. at 658. The courts have not been unmindful of the dangers of abuse inherent in the contempt power, but have found sound justification for it, nevertheless: "Summary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes. But the very practical reasons which have led every system of law to vest a contempt power in one who presides over judicial proceedings also are the reasons which account for it being made summary. * * * The rights and immunities of accused persons would be exposed to serious and obvious abuse if the trial bench did not possess * * * power to curb prejudicial and excessive zeal * * *. The interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by [defendants]." Sacher v. United States, supra, 343 U.S. at 8, 72 S.Ct. at 454. Without the contempt power, courts would find it most difficult to control the disorderly and the violent who respect neither the laws enacted for the vindication of public and

8. It is important to note the distinction between the totally different procedure that is involved in the punishment of criminal contempt committed in the court's presence as against a criminal contempt committed against an order or decree of the court. This distinction is illustrated by the procedure followed in Green v. United States, supra, where the latter class of contempt was at issue. In Green, defendants, who were convicted under the Smith Act, were enlarged on bail pending appeal but failed to appear on the date fixed for surrender. After surrendering to the Marshal they were tried under 18 U.S.C. § 401 and 42(b) Fed.R.Crim.P. for wilful disobedience of the surrender order. Rule 42(b) provides that criminal contempts other than those committed in the court's presence or hearing shall be prosecuted by notice. The rule also states that a defendant is entitled to trial by jury if an Act of Congress so provides. And 18 U.S.C. § 3691, dealing with trial by jury for criminal contempt (see footnote 10 infra) carries forward the procedural distinction between disobedience of court orders and disobedience in the courtroom by providing that the jury trial provision does not apply to courtroom contumacy. In Green, Mr. Justice Black dissented from the majority opinion which *inter alia* denied the petitioner's claim to the right to be tried on an indictment and by a jury on the charge of wilfully disobeying a court order, but Mr. Justice Black's dissent was not directed to the issue of whether disobedience in the courtroom should be punished only after trial by jury. But see Sacher v. United States, supra, 343 U.S. at 20–23, 72 S.Ct. at 460–462 (dissenting opinion).

private rights nor the officers charged with the duty of administering them. Yates v. United States, supra, 355 U.S. at 70, 78 S.Ct. at 131; Ex parte Terry, supra, 128 U.S. at 313, 9 S.Ct. at 82.

Despite the efforts of court and counsel, they have been unsuccessful in finding a case directly dispositive of Mirra's contention. However, the dicta in In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897); Jurney v. MacCracken, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802 (1935); and Merchants Stock and Grain Co. v. Board of Trade, 201 F. 20 (8th Cir. 1912) lends support to the conclusion that Mirra is not entitled to the Double Jeopardy guarantee. In Chapman, the Supreme Court upheld a conviction under a Federal statute which made refusal to testify before a Senate committee punishable as a misdemeanor even though the contemnor was also subject to punishment for contempt of Congress. Mr. Justice Fuller, addressing himself to the problem of cumulative punishment resulting from the possibility that the United States Senate might still hold the convicted defendant in contempt, wrote:

> "It is improbable that in any case cumulative penalties would be imposed, whether by way of punishment merely, or of eliciting the answers desired, but it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offences may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together." In re Chapman, supra, 166 U.S. at 672, 17 S.Ct. at 681.

In Jurney v. MacCracken, supra, 294 U.S. at 151, 55 S.Ct. at 380, the contemnor argued that his conviction for contempt of Congress was improper because his conduct was also subject to prosecution under a special Federal statute. The offense in MacCracken could have been punished twice—once for contempt and again under the statute which made a refusal to answer questions or to produce papers before either House of Congress a misdemeanor. Mr. Justice Brandeis dismissed the argument that the defendant was immune from one punishment because of the existence of the other. He stated: "Punishment, purely as such, through contempt proceedings, legislative or judicial, is not precluded because punishment may also be inflicted for the same act as a statutory offense." Ibid. But the most direct confrontation of the issue of whether conduct deemed contumacious may at a subsequent date be made the basis of a criminal prosecution finds expression in the Merchants' Stock & Grain case, supra, 201 F. at 27: "An act which is a contempt of court and also a crime may be punished both by the summary provision and by indictment, and neither will bar the other. * * * In other words, the provision protecting him against being twice put in jeopardy does not protect him against being punished for contempt and under indictment for the same act. In view of these facts * * * it is not to be wondered that the Supreme Court has characterized contempt proceedings as *sui generis*." Id.[9] 201 F. at 27. The court finds the rationale of these dicta to be sound. It is undeniable that outrageous conduct destructive of the court's decorum can be an offense against the court's jurisdiction as well as an offense against the laws of the United States. To permit a defendant to escape the consequences of his contumacy via the Double Jeopardy route would be to

9. "The contempt power of American courts is truly *sui generis*," to adopt a favorite cliche of our judiciary.

"The argument that contempt is of a *sui generis* nature because it has cus-tomarily been treated peculiarly, and that it is treated this way because it is *sui generis* is of questionable appeal." Goldfarb, The Constitution and Contempt of Court, supra at 283, 299.

countenance a state of affairs where judges could become ineffectual in restoring judicial decorum for fear that a contempt conviction would raise a constitutional bar to a subsequent prosecution of the same act.

Let us consider by way of illustration the consequences of upholding Mirra's claim in the context of an extreme but not wholly improbable case that could have arisen after, and out of, Mirra's contempt conviction. Assume that Mirra's projectile had received more accurate a propulsion and had scored on its intended target—the Assistant United States Attorney. And assume further the grisly and morbid fact that the Assistant United States Attorney had sustained an injury which ultimately proved fatal. To sustain Mirra's claim would, in effect, grant a summary contemnor immunity from a homicide prosecution—an unconscionable result. Merely to state the case suffices to reveal what must perforce be the answer to Mirra's theory.

■ Moreover, a criminal prosecution arising out of and subsequent to summary contempt conviction does not offend the policy underlying the protection against Double Jeopardy. As Mr. Justice Brennan has stated in Abbate v. United States, 359 U.S. 187, 199, 79 S. Ct. 666, 673, 3 L.Ed.2d 729 (1959), "The basis of the Fifth Amendment protection against double jeopardy is that a person shall not be harassed by successive trials; that an accused shall not have to marshal the resources and energies necessary to his defense more than once for the same alleged criminal acts." Id.

359 U.S. at 198–199, 79 S.Ct. at 672–673. A person held in summary contempt and then subsequently indicted does not suffer the harassment of successive trials. The court recognizes, however, that to some extent this argument is circular. Successive trials are not involved because the effective remedy against a contempt committed in the court's presence is for the court immediately and summarily to punish the contumacious conduct. See Fed.R.Crim.P. 42(a). And since an adversary type proceeding does not precede the swift imposition of a summary contempt conviction, a criminal prosecution on a charge arising out of the contumacious conduct is the first trial-type harassment to which the contemnor is made subject. In the present posture of the law, a rebellious person does not have the option, and wisely so, of having the issue of his alleged contumacy determined by a trial-type hearing. Congress has seen fit to protect the dignity and decorum of the court by empowering the Federal courts to redress, spontaneously and summarily, an outrage or indignity committed in the court's presence. 18 U.S.C. § 3691.[10] It is true, of course, that the alleged contemnor does not have a choice in the matter of whether he is to be punished summarily or only after a hearing but it is the fact, nevertheless, that the summary contemnor is not subjected to the harassment which the Double Jeopardy protection seeks to prevent.

Defendant's reliance on United States v. Sabella, 272 F.2d 206 (2d Cir. 1959) and Abbate v. United States, supra, is clearly misplaced. Both those cases deal with successive criminal prosecutions of

10. 18 U.S.C. § 3691 provides:
*"Jury trial of criminal contempts*
"Whenever a contempt charged shall consist in willful disobedience of any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing or omitting any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense under any Act of Congress, or under the laws of any state in which it was done or omitted, the accused, upon demand therefor, shall be entitled to trial by a jury, which shall conform as near as may be to the practice in other criminal cases.

"This section shall not apply to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States."

the same set of facts by the Federal government. Neither of those cases, nor any of the others cited by Mirra, support his position.

Accordingly, the motion to dismiss the indictment is denied. So ordered.