THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARBARA LOGSDON, Defendant-Appellant.

Fifth District    No. 5—92—0494

Opinion filed April 5, 1995.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kevin Parker, State's Attorney, of Effingham (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a jury trial in the circuit court of Effingham County, defendant, Barbara Logsdon, was convicted of child abduction (Ill. Rev. Stat. 1987, ch. 38, par. 10—5(b)(1) (now 720 ILCS 5/10—5(b)(1) (West 1992))), sentenced to one year of probation, and ordered to seek counseling and perform 120 hours of public service work. The issue before us is whether the trial court erred in refusing defendant's tendered instruction on indirect criminal contempt. We affirm.

I

For purposes of this appeal, the facts are straightforward. On March 9, 1989, defendant was charged by information with child abduction. The information alleged that defendant intentionally violated the terms of a valid court order granting custody of Robin Logsdon to Ray Logsdon, defendant's ex-husband. Defendant and Ray

were married twice. They first married in September 1980 and divorced in May 1981. The second marriage lasted from April 1983 to July 1984. Defendant and Ray have three children. Duane was born on February 13, 1984, Matthew on January 22, 1985, and Robin on October 13, 1986. Initially, defendant had custody of all three children; however, on October 24, 1988, Ray was successful in obtaining a modification of the custody order. The modified order allowed defendant only "reasonable" visitation rights. According to Ray, he interpreted "reasonable" to mean every other weekend. On February 18, 1989, defendant picked up the three children but did not return them the next day. On February 21, 1989, Ray regained custody of Matthew and Duane, but defendant refused to return Robin. Instead, defendant obtained an emergency temporary restraining order in Coles County on March 2, 1989, to keep Ray away from Robin. On March 9, 1989, a hearing was held, after which the restraining order was dismissed, and defendant was ordered to return Robin to Ray. When defendant still refused to hand over Robin, an emergency hearing was held in Effingham County, without notification to defendant, ordering defendant to relinquish Robin. A warrant was then issued for defendant's arrest.

Kim Rhodes, a master sergeant with the Illinois State Police, testified about dealings she had with defendant on March 9, 1989, while attempting to get defendant to turn over Robin. Rhodes testified that defendant's refusal to comply with the court order stemmed from defendant's belief that Ray was abusing Robin. Rhodes and a colleague convinced defendant to turn over Robin by assuring defendant that Robin would go to a foster home that evening. However, after getting defendant to turn over Robin, Ray's attorney provided copies of court orders showing that Ray had custody of Robin. Ray's attorney then insisted that Robin be turned over to Ray, not to foster care.

Marla Williams, a registered nurse, testified for the defense. Defendant brought Robin to the emergency room on February 21, 1989, at 7:20 p.m., and Williams treated Robin. According to Williams, Robin had drainage from her ear, and her genital area was raw and red. Defendant complained that she suspected Ray of abusing Robin. Williams reported the case to the Department of Children and Family Services (the Department). On cross-examination, Williams admitted that ear infections occur in the most well-cared-for children and that Robin's genital redness might have been nothing more than diaper rash.

David Hunter, a social worker at the hospital where defendant took Robin, testified that he met with defendant and Robin after

Robin's examination. Hunter did not notice anything out of the ordinary until he attempted to discuss "Daddy" with Robin. At that time, Robin became frightened and looked to defendant for reassurance. On cross-examination, over defense counsel's objections, Hunter testified that defendant told him that a scab on her upper lip was the result of Ray's beating her for taking Robin to the doctor. Hunter also stated that he had no way to be sure how defendant's lip was injured. He admitted that the scab could have been a healing cold sore or it could have been caused by a number of injuries such as walking into a tree branch. Defendant also told Hunter that Ray chased her on a separate occasion when she tried to take Robin to the hospital. Hunter stated that defendant told him that she had reported her husband to the Department in 1984 for fondling her two sons from a previous marriage and that she was disappointed in the way the Department handled the case. Hunter suggested that defendant contact the Coalition Against Domestic Violence (the Coalition).

Defendant testified on her own behalf. She stated that after Ray gained custody of the children in October 1988, he prevented her from seeing them until January 13, 1989, at which time Ray called her and told her to pick up the children. During that weekend visit, defendant took Robin to the hospital because of a foot infection. Ray became incensed after learning that defendant took Robin to the hospital. According to defendant, Ray pulled one of the boys from the car, which caused her to cut her hand and mouth. Defendant claims she reported this incident to the sheriff.

Defendant scheduled another visit on February 17, 1989. Defendant maintains that there was no agreement as to when she would return the children. While giving the children a bath that evening, defendant discovered that the boys had long thin bruises on their upper legs and lower backs. She also noticed that Robin's genitals were red and swollen with a yellowish/greenish discharge. The children told defendant they did not want to return to Ray's.

Defendant called the Department to report allegations of abuse. A Department worker met with defendant on February 19, 1989, at defendant's home to make a report. According to defendant, she made several calls to the Department in an attempt to find out what the Department planned to do about her report. When she had not heard from the Department by February 21, 1989, she took the children to a shelter in Olney. Ray later learned of their whereabouts, went to the shelter, and took the two boys with him. Upon learning that Ray picked up the boys, defendant left the shelter. She took Robin to a hospital for examination. After the examination, defendant took Robin to a Coalition shelter in Charleston, where they

remained for the next week. On March 2, 1989, defendant obtained the *ex parte* order of protection and returned to her home with Robin. A hearing was scheduled on March 9, 1989. During that hearing, defendant admitted that she violated a court order by failing to return Robin to Ray, but she explained that she did so because she put her child's welfare first. A permanent order was not entered.

After the hearing, defendant went to her mother's house, where Ray and the police were waiting. The police convinced defendant to turn Robin over to them by telling defendant they would put Robin in a foster home for the evening until the matter could be settled. As previously discussed, Robin was returned to Ray, not foster care. Defendant denied making false allegations against Ray in order to punish him.

Jerry Boyd, a licensed clinical psychologist, testified in rebuttal for the prosecution. Boyd examined defendant in December 1989, at which time he diagnosed defendant as suffering from adjustment disorder with depressed mood, paranoia, and borderline personality disorder. According to Boyd, a manifestation of paranoia is making false reports about others. Boyd could not be sure, but he believed that defendant probably suffered from paranoia in February and March 1989.

Ray testified in rebuttal that after the custody modification in 1988, defendant did not attempt to contact her children until the middle of January 1989. In February, when defendant planned another visit, Ray specifically told her to have the children back by 6 p.m. on Sunday. This was corroborated by Ray's daughters from a previous marriage. Ray also testified that he was visited at least 10 times by the Department between September and October 1988, regarding allegations of abuse. With one exception in 1991, concerning Ray's failure to take the children to scheduled doctors' appointments, the Department had not found that Ray had neglected or abused his children.

Sam Buzzard, a social worker with the Department, also testified in rebuttal. He stated that between September 1988 and February 1991, he received nine complaints about Ray's treatment of his children. Defendant made three of these reports, while the remaining six were made by others who knew defendant and who received their information from defendant. Additionally, since September 1988, until the time of trial, defendant had called or visited the Department over five times. Buzzard believes that Ray is a conscientious parent.

The trial court refused to give defense counsel's lesser-included-offense instruction on indirect criminal contempt. The trial court determined that the State could not have brought contempt charges

in the civil matter in Fayette County, nor could it have charged defendant with criminal contempt because there is no such crime in the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 1—1 *et seq.* (now 720 ILCS 5/1—1 *et seq.* (West 1992))). Ultimately, the jury found defendant guilty of child abduction, and she was sentenced as previously set forth.

## II

The issue we are asked to consider is whether the trial court erred in refusing defendant's tendered instruction on indirect criminal contempt. Defendant contends that the trial court erred in refusing defendant's tendered instruction because indirect criminal contempt is a lesser-included offense of child abduction. Moreover, defendant contends that the State can prosecute for indirect criminal contempt. The State replies that the trial court properly refused defendant's lesser-included-offense instruction. We agree with the State.

The statute charging child abduction (Ill. Rev. Stat. 1987, ch. 38, par. 10—5(b)(1) (now 720 ILCS 5/10—5(b)(1) (West 1992))) and indirect criminal contempt for failure to comply with the custody order are indeed similar offenses. The elements of indirect criminal contempt are: (1) the existence of a court order, and (2) a wilful violation of that court order. (*In re Marriage of D'Attomo* (1991), 211 Ill. App. 3d 914, 918, 570 N.E.2d 796, 799.) As for child abduction:

"(b) A person commits child abduction when he or she:
(1) Intentionally violates any terms of a valid court order granting sole or joint custody *** to another, by concealing or detaining the child or removing the child from the jurisdiction of the court." Ill. Rev. Stat. 1987, ch. 38, par. 10—5(b)(1) (now 720 ILCS 5/10—5(b)(1) (West 1992)).

See *People v. Rodriguez* (1987), 162 Ill. App. 3d 149, 514 N.E.2d 1033.

It is true that a defendant may be convicted of an offense not expressly included in the charging instrument if that offense is a lesser-included offense of the crime expressly charged. (*People v. Jones* (1992), 149 Ill. 2d 288, 292, 595 N.E.2d 1071, 1073.) A lesser-included offense is one composed of some, but not all, of the elements of the greater offense, and which does not have any element not included in the greater offense. (*Jones,* 149 Ill. 2d at 292-93, 595 N.E.2d at 1073.) It has been said that the offense of indirect criminal contempt is a lesser-included offense of child abduction because each requires proof that the defendant intentionally violated a custody order. (*People v. Rodriguez* (1987), 162 Ill. App. 3d 149, 514 N.E.2d 1033.) However, in *Rodriguez,* the issue of whether indirect criminal

contempt is a lesser-included offense of child abduction was raised in relationship to a determination of whether a prior contempt charge barred a prosecution for child abduction on double jeopardy grounds. The *Rodriguez* court determined it did.

Likewise, in *People v. Doherty* (1988), 165 Ill. App. 3d 630, 518 N.E.2d 1303, primarily relied on by defendant, indirect criminal contempt was again found to be a lesser-included offense of child abduction. However, the *Doherty* court determined that the contempt charge in that case was civil rather than criminal because it gave the defendant the unconditional right to purge his contempt, and therefore, the previously filed criminal charges for child abduction were not prohibited. Assuming, *arguendo*, that the contempt was criminal rather than civil, the *Doherty* court distinguished the *Rodriguez* case, in which a prosecution on child abduction subsequent to a finding of indirect criminal contempt was prohibited on double jeopardy grounds. The *Doherty* court stated:

> "While double jeopardy principles prohibit successive prosecutions for a greater and lesser included offense [citation], exceptions have been recognized to allow successive prosecutions when reasonable or necessary, as where the first indictment takes place before the more serious crime has been completed, or the relevant facts discovered. [Citations.] Expressed in general terms, 'successive prosecution on a greater offense may be permitted where justified by the public interest in law enforcement and the absence of prosecutorial overreaching.' [Citation.]" (*Doherty*, 165 Ill. App. 3d at 638-39, 518 N.E.2d at 1308.)

Similarly, in the instant case we find an exception to the general rule which entitles a defendant to an instruction on a lesser-included offense if that offense is a lesser-included offense of the crime expressly charged. *People v. Cramer* (1981), 85 Ill. 2d 92, 95-98, 421 N.E.2d 189, 190-91.

We first point out that *Rodriguez* and *Doherty* are distinguishable from the case at bar in that in both those cases the question was posed to determine whether double jeopardy attached. Here, the question was posed after defendant requested an instruction on indirect criminal contempt during a trial in which the only charge was child abduction. The offense of indirect criminal contempt is not a crime under the Code. (See Ill. Rev. Stat. 1987, ch. 38, par. 1—1 *et seq.* (now 720 ILCS 5/1—1 *et seq.* (West 1992)).) Moreover, as the prosecutor in the instant case pointed out, the Effingham County State's Attorney's office would not be the proper office to charge defendant with indirect criminal contempt for wilful violation of a child custody order entered in Fayette County. Such a charge would

be sought by the Fayette County State's Attorney's office, as contumacious conduct may only be punished by the court which is actually offended by the conduct. (*In re Marriage of Alush* (1988), 172 Ill. App. 3d 646, 527 N.E.2d 66.) A sanction for criminal contempt is designed, *inter alia*, to preserve the dignity and the authority of the court. (*People ex rel. Chicago Bar Association v. Barasch* (1961), 21 Ill. 2d 407, 173 N.E.2d 417.) In the instant case, the trial court's dignity and authority were not attacked by defendant's wilful violation of the Fayette County custody order.

Accordingly, we believe the trial court was correct to refuse defendant's tendered lesser-included-offense instruction, since the underlying custody order was entered in Fayette County and indirect criminal contempt is not an offense under the Code. The State sought one criminal charge against defendant, the one which was proper under the Code in such circumstances.

For the foregoing reasons, the judgment of the circuit court of Effingham County is affirmed.

Affirmed.

MAAG, P.J., and LEWIS, J., concur.